### PALMER v. LOW.

1. Under *Donner* v. *Palmer* (31 Cal. 500), which establishes a rule of property in California, the courts of the United States accept as competent primary evidence of alcalde grants of the pueblo land of San Francisco, the record of them, which, in accordance with the requirements of Mexican laws, was kept by the alcalde before the date of the incorporation of the city of San Francisco by that State, and which record, now in the custody of the city and county recorder, is known as one of the books of the former alcalde's office, the same having been, pursuant to law, turned over to the county recorder's office.

2. A grant appearing in that record is in the following form:—

    "No. 39.

    "Whereas George Donner has presented a petition soliciting for a grant of a title to a lot of ground as therein described, therefore I, the undersigned, alcalde, do hereby give, grant, and convey unto the said George Donner, his heirs and assigns for ever, lot number thirty-nine (39), one hundred varas square, in the vicinity of the town of San Francisco, subject to all the rules and regulations governing in such cases.

    "In testimony whereof, I have hereunto set my hand as alcalde, this nineteenth day of July, A.D. 1847.

    "GEORGE HYDE, *1st Alcalde.*"

    *Held,* that the terms used are sufficient to pass a title in fee to the land, and that, in the absence of any thing to the contrary, the instrument must be presumed to be sufficient in form to give full effect to the evident intention of the parties.

3. That grant was made to an infant, but it has remained uncancelled, and was affirmed before the ordinance of the city council, known as the Van Ness

ordinance, passed June 20, 1855, was approved by Congress. *Held,* that his title is superior to that of a party who, without right, entered upon the land, and whose claim thereto, arising out of his possession thereof, is grounded solely upon the enacting clause of that ordinance.

4. In ejectment, commenced April 30, 1872, it appearing that the grantors of the plaintiff entered without title, in 1851 or 1852, and that they and he continued until May 8, 1867, in the exclusive and adverse possession of the land covered by that grant, when said Donner, under whom the defendant claimed title, was placed in possession by the proper officer, under legal process issued in a suit to which neither the plaintiff nor any of his grantors deriving title from any party to the suit after the commencement thereof was a party. *Held,* that as the title did not pass out of the United States until the passage by Congress of the act of July 1, 1864 (13 Stat. 332), to "expedite the settlement of the titles to lands in the State of California," the Statute of Limitations of that State did not run in favor of the plaintiff, by reason of his own and his grantors' possession, so as to transfer to him a title which could be asserted against the record title of the defendant.

ERROR to the Circuit Court of the United States for the District of California.

This was an action of ejectment, commenced April 30, 1872, by Daniel Palmer, the plaintiff in error, against Joseph W. Low, S. O. Houghton, and others, to recover possession of a portion of a one hundred vara lot No. 39, part of the pueblo lands of San Francisco, lying east of Larkin Street and northeast of Johnston Street. The city of San Francisco was first incorporated by the State of California, April 15, 1850, with certain defined boundaries. Acts of 1850, p. 223. It was the successor of the Mexican pueblo of Yerba Buena, or San Francisco. The original charter was repealed, and a new one granted, April 15, 1851. Acts of 1851, p. 357. The premises in controversy are within the boundaries of the city, as defined in this last act of incorporation, and constitute part of the lands claimed from the United States by the city, on account of its succession to the property and rights of the pueblo.

On the 20th of June, 1855, the city council of San Francisco passed an ordinance, known as the Van Ness ordinance, the sections of which material to the present controversy are as follows : —

" SECT. 2. The city of San Francisco hereby relinquishes and grants all the right and claim of the city to the lands within the corporate

limits to the parties in actual possession thereof, by themselves or tenants, on or before the first day of January, A.D. 1855, and to their heirs and assigns for ever, excepting the property known as the slip property, and bounded on the north by Clay Street, on the west by Davis Street, on the south by Sacramento Street, and on the east by the water-line front; and excepting also any piece or parcel of land situated south, east, or north of the water-lot front of the city of San Francisco, as established by an act of the legislature of March 26, A.D. 1851: *Provided*, such possession has been continued up to the time of the introduction of this ordinance in the common council, or, if interrupted by an intruder or trespasser, has been or may be recovered by legal process; and it is hereby declared to be the true intent and meaning of this ordinance, that when any of the said lands have been occupied and possessed under and by virtue of a lease or demise, they shall be deemed to have been in the possession of the landlord or lessor under whom they were so occupied or possessed: *Provided*, that all persons who hold title to lands within said limits by virtue of any grant made by any ayuntamiento, town council, alcalde, or justice of the peace of the former pueblo of San Francisco, before the seventh day of July, 1846, or grants to lots of land lying east of Larkin Street and northeast of Johnston Street, made by any ayuntamiento, town council, or alcalde of said pueblo, since that date and before the incorporation of the city of San Francisco by the State of California; and which grant, or the material portion thereof, was registered, or recorded, in a proper book of record deposited in the office or custody or control of the recorder of the county of San Francisco, on or before the third day of April, A.D. 1850; or by virtue of any conveyance duly made by the commissioners of the funded debt of the city of San Francisco, and recorded on or before the first day of January, 1855, shall, for all the purposes contemplated by this ordinance, be deemed to be the possessors of the land so granted, although the said lands may be in the actual occupancy of persons holding the same adverse to the said grantees.

"SECT. 3. The patent issued or any grant made by the United States to the city shall inure to the several use, benefit, and behoof of the said possessors, their heirs and assigns, mentioned in the preceding section, as fully and effectually, to all intents and purposes, as if it were issued or made directly to them individually and by name."

"SECT. 10. Application shall be made to the legislature to confirm and ratify this ordinance, and to Congress to relinquish all the

right and title of the United States to the said lands, for the uses
and purposes hereinbefore specified.

" SECT. 11. Nothing contained in this ordinance shall be construed
to prevent the city from continuing to prosecute to a final deter-
mination her claim now pending before the United States land
commission for pueblo lands, for the several use, benefit, and be-
hoof of the said possessors mentioned in sect. 2, as to the lands by
them so possessed, and for the proper use, benefit, and behoof of
the corporation as to all other lands not hereinbefore released and
confirmed to the said possessors."

On the 11th of March, 1858, the legislature of the State of
California passed " An Act concerning the city of San Fran-
cisco, and to ratify and confirm certain ordinances of the com-
mon council of said city," whereby this ordinance was in all
respects ratified and confirmed.   Sect. 2 of that act is as fol-
lows : —

" SECT. 2. That the grant or relinquishment of title made by the
said city in favor of the several possessors by sects. 2 and 3 of the
ordinance first above recited shall take effect as fully and com-
pletely, for the purpose of transferring the city's interest, and for
all other purposes whatsoever, as if deeds of release and quitclaim
had been duly executed and delivered to and in favor of them
individually and by name; and no further conveyance or other act
shall be necessary to invest the said possessors with all the interest,
title, rights, benefits, and advantages which the said order and
ordinances intend or purport to transfer or convey, according to
the true intent and meaning thereof: *Provided*, that nothing in
this act shall be so construed as to release the city of San Fran-
cisco, or city and county of San Francisco, from the payment of
any claim or claims due or to become due this State against said
city, or city and county, nor to effect or release to said city and
county any title this State has or may have to any lands in said
city and county of San Francisco."   Cal. Acts 1858, p. 52.

Afterwards, on the 1st of July, 1864, Congress passed " An
Act to expedite the settlement of the titles to lands in the
State of California " (13 Stat. 332), sect. 5 of which is as
follows : —

" SECT. 5. And be it further enacted, that all the right and title
of the United States to the lands within the corporate limits of the

city of San Francisco, as defined in the act incorporating said city, passed by the legislature of the State of California on the 15th of April, 1851, are hereby relinquished and granted to the said city and its successors, for the uses and purposes specified in the ordinances of said city ratified by an act of the legislature of the said State, approved on the 11th of March, 1855, entitled ' An Act concerning the city of San Francisco, and to ratify and confirm certain ordinances of the common council of said city,' there being excepted from this relinquishment and grant all sites or other parcels of lands which have been or now are occupied by the United States for military, naval, or other public uses, or such other sites or parcels as may hereafter be designated by the President of the United States within one year after the rendition to the General Land-Office by the surveyor-general of an approved plat of the exterior limits of San Francisco, as recognized in this section in connection with the lines of the public surveys: *And provided*, that the relinquishment and grant by this act shall in no manner interfere with or prejudice any *bona fide* claims of others, whether asserted adversely under rights derived from Spain, Mexico, or the laws of the United States, nor preclude a judicial examination and adjustment thereof."

Both parties claim title under this ordinance and this legislation of the State and of Congress. A jury was waived on the trial below, and the court made and filed its finding of facts, from which it appears, —

1. That the grantors of the plaintiff entered into the possession of the premises in controversy, without title, about the year 1851 or 1852, and they and the plaintiff continued in the exclusive and adverse possession thereof down to the 8th of May, 1867, when the grantor of the defendant, S. O. Houghton, was placed in possession thereof by the sheriff of the city and county of San Francisco, under legal process issued in the case of *Donner* v. *Palmer et al.*, to which suit neither the plaintiff nor any of his grantors deriving title from any party to the suit after the commencement thereof was a party.

2. On the 19th of July, 1847, George Hyde was the duly qualified and acting alcalde of the pueblo of San Francisco, and, as such alcalde, on the day last mentioned granted the premises in controversy to George Donner, by a grant thereof duly made, recorded, and delivered by the alcalde; and the

material portion of the grant was registered and recorded in a proper book of records, deposited in the office and in the custody and control of the recorder of the county of San Francisco, before the third day of April, 1850, and which book remained in the office and in the custody and control of the recorder until and on the third day of April, 1850, and has continued so to remain from that date.

3. That the defendant, S. O. Houghton, has, through mesne conveyances, acquired all the right, title, and interest of Donner in the premises, and that the defendants other than Houghton were, at the time the action was commenced, in possession as tenants under him.

4. At the time of the alleged grant to him, Donner was an infant of about ten years of age.

To prove the grant to Donner, the defendants offered in evidence an entry on " Book A " of original grants, from the custody of the county recorder of the city and county of San Francisco, which is as follows : —

### "Lot No. 39.

" Whereas George Donner has presented a petition soliciting for a grant of a title to a lot of ground as therein described, therefore I, the undersigned alcalde, do hereby give, grant, and convey unto the said George Donner, his heirs and assigns for ever, lot number thirty-nine (39), one hundred varas square, in the vicinity of the town of San Francisco, subject to all the rules and regulations governing in such cases.

" In testimony whereof, I have hereunto set my hand as alcalde, this nineteenth day of July, A.D. 1847.

" GEORGE HYDE, <i>1st Alcalde.</i>"

In connection with this offer, it was satisfactorily shown that " Book A " was part of the archives of the office of the city and county of San Francisco, and it was admitted that the book was the original " Book A " of alcalde grants in the custody of the city and county recorder, and known in the office as one of the books turned over to the county recorder's office in pursuance of the directions of the statutes of California, as one of the books of the former alcalde's office. It was satisfactorily proved that the signature of George Hyde to the alcalde entry

of grant, or memorandum of grant, is in his handwriting, and his genuine signature, and that at the date of the entry he was the acting alcalde of San Francisco.

To the introduction of this entry in "Book A" plaintiff's counsel objected, "on the ground that it was incompetent, irrelevant, and immaterial, also on the ground that it is not primary evidence, or the best evidence, of a grant having been made to George Donner ; that it is but secondary evidence, for the introduction of which no foundation had been laid ; that there has been no proof of the loss or destruction of the original instrument, of which the said entry is a mere memorandum; that the entry in 'Book A' of original grants is a mere memorandum made by the alcalde ; that the grant should have been made and signed by both parties, the grantor and grantee, and should have been attested by parties as witnesses of the fact; that the whole proceeding should have been set out on that book ; that if it be a mere memorandum-book, it was indicative merely that there was some other instrument which had to be executed and delivered, and which is primary evidence in the case."

These objections were overruled by the court, and an exception was then and there taken by the plaintiff.

Sect. 6 of an act of the legislature of California, "defining the time for commencing civil actions," passed April 22, 1850, is as follows : —

"SECT. 6. No action for the recovery of real property, or for the recovery of the possession thereof, shall be maintained, unless it appear that the plaintiff, his ancestor, predecessor, or grantor, was seised or possessed of the premises in question, within five years before the commencement of such action." Acts of 1850, 344, sect. 6.

On the 11th of April, 1855, this section was amended by adding the following proviso : —

"*Provided, however*, that an action may be maintained by a party claiming such real estate, or. the possession thereof, under title derived from the Spanish or Mexican governments, or the authorities thereof, if such action be commenced within five years from the time of the final confirmation of such title by the govern-

ment of the United States, or its legally constituted authorities."
Acts 1855, 109, sect. 1.

On the 18th of April, 1863, this proviso was repealed, and
the following enacted as a substitute : —

"SECT. 6. . . . *And provided further*, that any person claiming
real property, or the possession thereof, or any right or interest
therein, under title derived from the Spanish or Mexican govern-
ments, or the authorities thereof, which shall not have been finally
confirmed by the government of the United States, or its legally
constituted authorities, more than five years before the passage of
this act, may have five years after the passage of this act in which
to commence his action for the recovery of such real property, or
the possession thereof, or any right or interest therein, or for rents
or profits out of the same, or to make his defence to an action
founded upon the title thereto. . . .

"SECT. 7. Final confirmation, within the meaning of this act,
shall be deemed to be the patent issued by the government of
the United States, or the final determination of the official survey
under the provisions of the act of Congress, entitled 'An Act to
amend an act entitled an act to define, &c., approved June 14,
1860.'"    Cal. Acts 1863, 327.

Upon this state of facts the court below found as conclusions
of law, —

"1. That defendant, S. O. Houghton, by virtue of said
grant to said Donner, the said ordinance of the city of San
Francisco, and the said acts of the legislature of California
and of Congress, and the said mesne conveyances from said
Donner to him, is the owner of, and has the legal title to, said
demanded premises, and that the defendants are lawfully and
rightfully in the possession thereof.

"2. That the Statutes of Limitations have not run in favor
of the plaintiff, by reason of his own and his grantor's posses-
sion, from 1851 or 1852 to May 8, 1867, and that such possession
gives him no title as against defendants."

Judgment having been rendered in favor of the defendants
in accordance with this finding, the plaintiff below sued out
this writ of error, and assigns, in substance, for error the ruling
of the court admitting " Book A " as primary evidence to prove

the grant to Donner, and the judgment for the defendants upon the facts as found.

*Mr. Walter H. Smith* and *Mr. James K. Redington* for the plaintiff in error.

1. Both parties claim under the Van Ness ordinance of June 20, 1855, the California act of March 11, 1858, and the act of Congress of July 1, 1864, confirming the title of San Francisco to certain lands.

As the plaintiff had actual, adverse, and exclusive possession of the demanded premises from 1851 to 1867, the enacting clause of that ordinance relinquished and granted to him the claim and right of the city to them. He therefore made out a clear *prima facie* title to recover.

2. The defendant cannot defeat that *prima facie* title, unless he produces first a grant of the premises, and, secondly, a record, showing that the "grant, or a material portion of it, was registered." These two substantive and independent facts must be established by legal evidence, to bring his case within the proviso to that ordinance.

The grant must, of course, be in such form as would possess intrinsic validity and transfer the title, if the alcalde had been vested with power to make it, and the grantee must have been competent to take.

The "Plan of Pitic," founded upon a royal ordinance, was not pursued in later years by the Mexican alcaldes in San Francisco, but was partially superseded by a custom which prevailed in July, 1846, when Upper California was conquered by the military forces of the United States. Dwinelle, Col. Hist. of San Francisco, 111. By that custom the only document containing the "entire proceedings" was "signed and attested in due form by the proper officer," and delivered to the grantee; whilst the record-book contained a mere condensed copy or summary statement, often not signed at all, and it omitted the condition that the grantee should build a house on the land within a year, and conform to the police regulations. Id. 162–165. The grant was not produced nor its absence accounted for; and the pretended grantee, under whom the defendant claims, was then a child ten years old, and consequently incapable of performing the required condition.

"Book A" was inadmissible to prove an original grant. It could only be allowed upon the footing of mere secondary evidence, after the necessary preliminary proof had been made. It is not like a common-law record of proceedings in court, for that is itself an original, and supposes no better evidence in existence; whereas a record or registry of a deed or other instrument is only a copy, and presupposes an original. 2 Phill. Evid. 490; *Brooks* v. *Marbury*, 11 Wheat. 79; *Rice* v. *Cunningham*, 29 Cal. 492.

During the time which elapsed between the conquest of California and the establishment of her State government, an American officer, who acted as alcalde and granted pueblo lands, was bound to conform to pre-existing laws and customs until they were superseded by the conqueror. They made the delivery of the grant an essential prerequisite to the investiture of title, and in that respect conformed to the common-law doctrine applicable to the forms of conveyance prevailing in the United States, which were after the conquest introduced in California.

The record is not primary evidence of the execution and delivery of the alleged grant, and if it were, the grant as it there appears — containing no condition whatever — passed no right to the land.

3. Plaintiff's possession for the period prescribed by the Statute of Limitations vested in him a title which he could affirmatively assert against any adverse right or claim. *Shelly* v. *Guy*, 11 Wheat. 370; *Pendleton* v. *Alexander*, 8 Cranch, 469; *Leffingwell* v. *Warren*, 2 Black, 605; *Bradstreet* v. *Huntington*, 5 Pet. 402.

This proposition has been repeatedly affirmed by the Supreme Court of California in the construction of the statutes of that State. *Grattan* v. *Wiggins*, 23 Cal. 36; *Le Roi* v. *Rodgers*, 30 id. 234; *Arrington* v. *Liscom*, 34 id. 370, 371; *Cannon* v. *Stockman*, 36 id. 540; *San Francisco* v. *Fulde*, 37 id. 352.

4. The Statute of Limitations, set up by the defendants, was not a bar to this suit. *Richardson* v. *Williamson*, 24 Cal. 296; *Maris* v. *De Celis*, 51 id. 60; *Arrington* v. *Liscom, supra.*

*Mr. S. O. Houghton, contra.*

MR. CHIEF JUSTICE WAITE, after stating the facts, delivered the opinion of the court.

The questions presented for decision in this case may be stated as follows : —

1. Was the entry in original " Book A " of alcalde grants admissible as primary evidence to prove a grant to Donner ?

2. Did the record show a grant sufficient in form ?

3. Was the grant void because made to an infant ?

4. Was the action barred by the Statute of Limitations ?

These questions will be considered in their order.

1. As to the admissibility of the evidence.

The point of the inquiry is whether the record of alcalde grants of the pueblo lands of San Francisco, kept by the alcalde in accordance with the requirements of Mexican laws before the incorporation of the city of San Francisco by the State of California, in the custody of the city and county recorder, and known as one of the books of the former alcalde's office turned over to the county recorder's office, pursuant to the statutes of California, can be used as primary evidence of the recorded grants, or only as secondary evidence, after sufficiently accounting for the absence of the original certificate of grant issued to the grantee.

The rank in the scale of evidence which the Mexican archives occupy has been oftentimes the subject of consideration in the courts of California. As early as 1859, in the case of *Gregory* v. *McPherson* (13 Cal. 562), the question arose in reference to the admissibility of an expediente filed in the archives of the Mexican government, to prove a grant under the colonization laws, a copy of which grant, signed by the governor and countersigned by the secretary of state, was annexed to and formed a part of the expediente. The expediente itself consisted of the petition, plat, reference, report, act of concession, approval, grant, &c. It was rejected in the court below on the ground that it was secondary evidence only, and the absence of the copy of the grant which had been issued and delivered to the grantee had not been satisfactorily accounted for ; but the Supreme Court said (p. 572) : " We are at a loss to know upon what grounds such a document can be denied the weight of original evidence. It was made, and signed, and authenticated

as a record by public officers in the discharge of public duties. The papers were retained in the custody of the appropriate public officer for the purposes of proof, and the highest and most authentic proof, of their own action. The documents receive the stamp, and the most satisfactory stamp, of official authenticity. The signatures are made on this as on the papers sent out by the department. We cannot see why such papers should be called copies, or why, in the scale of proofs, they should stand in any subordinate relation to the paper handed to the grantee. If not counterparts, or duplicates, it would seem that the original paper is the record retained by the department as part of its public records. . . . We cannot presume that any governmental system of granting land could be so loose as that no records were preserved by the granting power. And it follows, we apprehend, as a universal rule, that wherever the acts of public officers are authenticated by their records, these records are evidence, in all courts of justice, of those acts. If by law, or usage having the force of law, a California grant was matter of record, then it would seem to follow that the record is proof of the grant, especially where, as in this case, the record is itself an exemplification of the grant, and contemporaneously signed by the same officers issuing the grant."

Following this, in 1864, was the case of *Downer* v. *Smith* (24 Cal. 114), where the question arose upon the admissibility of an entry of a grant of land in the pueblo of San José made in the book of alcalde grants; and although it was held that a statute of the State applicable to the county in which the lands were located made the entry admissible, it was said (p. 122), "We think the court was warranted in finding that the book was one of original entries, and therefore entitled to be admitted as evidence upon that ground." In *Rice* v. *Cunningham* (29 id. 492), decided in 1866, it best suited the purposes of one of the parties to use the same "Book A" which is now under consideration, as secondary evidence to prove an alleged lost grant, and thus avoid the effect of an apparent cancellation of the grant which appeared upon the face of the record; but the court said (p. 497), "The argument of counsel for the appellant, in support of their exception, is grounded upon a false assumption. They lower 'Book A' to the level of a chance copy-book, and

strip it of all its character and dignity as a public record of the transactions of a government official vested with the exercise of most important functions, and then seek to use it on a question not then before the court."

But in *Donner* v. *Palmer* (31 id. 500), decided in 1867, the precise question we are now considering was presented in reference to the identical grant under which the defendants in error claim, and it was held, after full argument, and with due regard to both the written and unwritten law of Mexico, including the " Plan of Pitic," so often alluded to in the argument here, that the entry was to be received as primary evidence. In the opinion, after copying the seventeenth section of the " Plan of Pitic," the court proceeds as follows (p. 508): " In view of this language, there can be no doubt as to the mode in which grants of town lots were to be made. The entire proceedings were to be first entered in the official book required to be kept for that purpose, signed and attested in due form by the proper officer. A copy or summary statement of the proceedings as contained in the official book, also duly signed and attested by the proper officer, was then to be given to the grantee as evidence of his title; and in the event of its loss, the officer in whose official custody the book might be at the time was authorized and required to give him another ' like copy ' of the original proceedings. The record so kept became an official and public record of the transactions of the alcaldes in the matter of granting town lots; and, as such, primary evidence of the acts they recited, under any system of law with which we are acquainted. Entries in such a book, if made in conformity with the regulations of the 14th of November, 1789, became, under the Mexican law, what is denominated an authentic instrument, that is to say, an instrument which proves itself, and, under the common law, an official record. Under both systems such entries have always been esteemed the highest and most satisfactory evidence of the facts which they recite, because they are made by the direction of the law, and are of public concern, and because they are made under the sanction of an oath, or, at least, of official duty, and made at or about the time the acts which they recite transpired. They are retained in the custody of the functionary or department by which they are required

to be kept, and are so retained for the express purpose of making them permanent and primary evidence of the transactions of the government.   1 Greenl. Evid., sect. 488 *et seq.*"

The result thus reached has never been disturbed, and it is clear that a rule of property has been established by the courts of the State, binding as well upon the courts of the United States as upon those of the State.   While the precise question presented to us was only decided in *Donner* v. *Palmer*, all the other cases point directly to the conclusion there reached, and it needed only the occasion to make the formal declaration. Certainly, if the Mexican archives possess the character which the courts have given them, there can be no doubt of the rank they take as evidence, under our system of jurisprudence. *Hedrick* v. *Hughes*, 15 Wall. 123.   We see no error in the admission of the testimony.

2. As to the form of the grant.

There can arise here no question as to the payment of municipal fees or the delivery of the grant; for the bill of exceptions shows that the court below found as facts upon the evidence contained in the record of the grant and other evidence submitted, that the municipal fees were paid, and that the grant was actually delivered.   Neither does any question arise as to the power of an American alcalde to make the grant; for the ordinance under which both parties claim, in terms confers the title upon grantees holding by such grants.

The only question then is as to the form of the instrument appearing in the record.   It is certain that it does not meet all the requirements contained in the " Plan of Pitic;" but the counsel for the plaintiff in error, in their argument here, say it is " beyond the reach of contradiction, and matter of history, that the ' Plan of Pitic ' was not pursued by Mexican alcaldes in San Francisco.   Grants were made in a very different manner, and quite repugnant to its requirements.   A long-established custom pursued by these alcaldes, under Mexican rule, modified and superseded the ' Plan of Pitic.' "   What these modifications were we have not been informed.   No authorities are cited upon the subject except those which go to show that after the conquest the American alcaldes usually followed the American system of conveyancing and registration.   *Donner*

v. *Palmer, supra;* Montgomery v. *Bevans,* 1 Sawyer, 653. We are then left to inquire whether the language of the grant is sufficient to pass the title, if there was no statute or custom prescribing the form in which such conveyances should be made. The government of the United States had not undertaken to regulate this subject, and the Mexican law, whatever it may have been, whether enacted by statute or established by custom, was in force; for the rule is well settled that the laws of a conquered territory, which regulate private rights, continue in force after the conquest until they are changed by the act of the conqueror. *American Insurance Co. et al.* v. *Canter,* 1 Pet. 511.

The language of this grant is: "I, the undersigned alcalde, do hereby give, grant, and convey unto George Donner, his heirs and assigns for ever," &c. These are the operative words of a present grant in fee-simple, and, being found in an official public record, will be presumed, in the absence of any thing to the contrary, to be sufficient to accomplish the purpose the parties had in view. While the alcalde was not the sovereign, he was the officer designated by law to make distribution of this kind of property among those to whom, under the Mexican law, it belonged; and the official record of his official acts, which the law requires him to keep, carries with it the presumption that his acts were in form such as was necessary to give full effect to what he was attempting to do.

This same question was presented to the Supreme Court of California in *Donner* v. *Palmer* (*supra*), and the same conclusion reached. As the point decided is one which relates to the effect to be given the statute of the State accepting and confirming the Van Ness ordinance, if not in fact the construction of a State statute absolutely binding upon us, it ought not to be disregarded except for imperative reasons.

3. As to the infancy of Donner.

We are not advised that the Mexican law prohibited such a grant to an infant. The distribution was to be made to "settlers," and was evidently left largely to the "wise judgment" of the "commissioner in charge." If he erred in his judgment, it might be cause for setting aside the grant in some appropriate direct proceeding for that purpose; but so long as the grant

remained uncancelled and duly recorded, it would certainly be
a grant within the letter of the Van Ness ordinance, and it was
so decided by the Supreme Court of California in *Donner* v.
*Palmer*, *supra*.   While infants cannot make grants, they may
accept them.   A grant to an infant is voidable, not void.   The
grant in this case has never been avoided, but, on the contrary,
affirmed, and that, too, long before the Van Ness ordinance was
confirmed by Congress.   The title of Donner, therefore, from
whom these defendants claim, was superior to that of the plain-
tiff under the ordinance.

4. As to the Statute of Limitations.

The nature of the title of San Francisco to her pueblo lands
has often been the subject of consideration in this court, and
was carefully stated by Mr. Justice Field in *Townsend* v. *Gree-
ley*, 5 Wall. 326, and *Grisar* v. *McDowell*, 6 id. 363.   At
the time of the conquest, the pueblo, of which the city of San
Francisco became the successor, did not have an indefeasible
estate in the unconveyed portion of these lands, but only a
limited right of disposition and use, subject in all particulars
to the control of the government of the country.   "It was a
right which the government might refuse to recognize at all,
or might recognize in a qualified form."   6 Wall. 373.   Upon
the conquest, the United States succeeded to the rights and au-
thority of the Mexican government, subject only to their obli-
gations under the treaty of Guadalupe Hidalgo.   As before
that time the fee had not passed out of the government of
Mexico, it was transferred to the United States by the conquest
and the treaty which followed.   Before, therefore, the estate
of the pueblo could become absolute and indefeasible, some ac-
tion was required on the part of the United States.   It is con-
ceded that this action was not taken until the act of July 1,
1864.   Down to that time the city held under its original im-
perfect Mexican title only.   Afterwards it was possessed of
the fee " for the uses and purposes specified " in the Van Ness
ordinance.

In *Henshaw et al.* v. *Bissell* (18 Wall. 255), we held in
effect that the State Statute of Limitations did not begin to run
against the title thus perfected until July 1, 1864 ; and this
decision was followed by the Supreme Court of California in

*Gardiner* v. *Miller*, 47 Cal. 576.   After the act of Congress no survey or patent was necessary for the consummation of the title.   *Ryan et al.* v. *Carter et al.*, 93 U. S. 78; *Morrow* v. *Whitney*, 95 id. 551.   But independently of this, and looking only to the statutes of the State, it is clear that, after 1855 until the act of 1863, there was no statute of limitations in California affecting titles derived from the Spanish or the Mexican government before their final consummation by the government of the United States.   The act of 1863 gave a right of action upon such titles for five years after the date of its passage; and within the five years, to wit, May 8, 1867, Donner, under whom the defendants claim, was put in actual possession of the premises, and he and they have continued in possession claiming title ever since.   The statute runs only so long as the adverse possession continues.   When the possession is ended the operation of the statute ceases, except in respect to titles previously acquired under it; for in California it is held that adverse possession for the requisite length of time transfers a title to the possessor, which may be asserted affirmatively against an otherwise valid record title.   *Arrington* v. *Liscom*, 34 Cal. 366.

It follows, then, that Palmer acquired no title by his possession from 1851 to 1867, as against the Donner title, if that title was derived " from the Spanish or Mexican government, or the authorities thereof; " and it seems to us clear that it was. It was so expressly decided by Mr. Justice Field in *Montgomery* v. *Bevans (supra)*; and the cases of *Townsend* v. *Greeley (supra)*, *Grisar* v. *McDowell (supra)*, and *Merryman* v. *Bourne et al.* (9 Wall. 592), evidently proceeded upon that assumption.   Donner claimed under the city of San Francisco, and the city under its equitable title derived from the Mexican government, finally ratified and confirmed by the United States.   Whatever rights the city had under the Mexican title it held for the use and benefit of the inhabitants; and the United States, by the act of 1864, relinquished and granted all their right and title for the same uses and purposes.   Clearly, therefore, the act of Congress could not have been intended as the grant of a new right, but simply as the confirmation of the old one.   The title of the city is the old imperfect title from Mexico, confirmed by the

authoritative recognition of Congress. Previous to the passage of this act, the city had prosecuted its claim against the United States under the act of March 3, 1851, to ascertain and settle private land-claims in California, and that action was still pending when this confirmatory statute was passed. The original claim being for a larger quantity of land than was embraced in this relinquishment, the suit went on in the courts until March 8, 1866, when the United States, by another statute " to quiet the title to certain lands within the corporate limits of the city of San Francisco " (14 Stat. 4), in terms confirmed the claim of the city to all the lands embraced in the decree of the Circuit Court then pending here on appeal. It is clear, therefore, that the case is within that part of the statute which relates to titles derived from the Mexican government.

One other question, arising under the Statute of Limitations, remains to be considered, and this grows out of the last clause in the proviso of the act of 1863, in which five years is given to the holder of a title derived from the Spanish or the Mexican government " to make his defence to an action founded upon the title thereto." If we understand correctly the position taken by counsel, it is that the holder of a title under a Mexican grant will not be permitted to set up his grant as a defence to an action brought against him for the recovery of the property granted, unless he makes his defence within five years after the date of confirmation, whether the suit in which the defence is to be made was commenced within that time or not. The courts of California have had no little difficulty in giving a construction to this and other kindred portions of this statute ; but whatever else it may mean, we think it clear that it cannot be what the plaintiff claims. The facts in this case present, in the strongest light, the utter absurdity of such an interpretation. The plaintiff's grantor entered into the possession of the premises in 1850 or 1851, without a shadow of title, and remained until May 8, 1867, when he was ousted. He acquired no title by his possession. The title under which he was ousted was a Mexican grant, not confirmed until July 1, 1864. The owner of this grant remained in peaceable possession, claiming title, until April 30, 1872, when this suit was begun. This was more than five years after the date of the

confirmation of the grant, but less than that time by eight days from the commencement of possession. As the possession of the owner had not ripened into a perfect title, he was driven to his defence under the grant. The plaintiff, a mere trespasser originally, having no right whatever except that of prior naked occupancy, purposely delaying his action for more than five years from the date of the confirmation of the grant, now seeks to get rid of the grant as a defence to his action, because it is more than five years old. If this be the operation of the statute, it has, in a single line, made substantially worthless as muniments of title all confirmed Mexican grants, and that, too, in a State where titles are so largely drawn from such sources. It would be monstrous to suppose the legislature could have been guilty of such folly.

The pleadings are sufficient to enable the defendants to avail themselves of their proof. In ejectment, the plaintiff recovers upon the strength of his own title, and not upon the weakness of that of his adversary. The plaintiff declared generally upon his title, without setting out the particulars. The answer of the defendant was a general denial. The plaintiff undertook to establish his title under the Van Ness ordinance, by proving the requisite possession. To rebut the effect of this evidence the defendants made proof of the grant, under which they claimed, to show that the title under the ordinance did not pass to the plaintiff. Until the plaintiff put in his testimony, there was nothing upon the record to show what his claim of title was. Certainly, under such circumstances, it was not incumbent on the defendant to state in his answer the matters on which he relied, to defeat any title that might be developed upon the trial.

*Judgment affirmed.*